MAY *v.* YUREK.

(Decided March 4, 1929.)

*Mr. Joseph L. Stern,* for plaintiff in error.
*Messrs. Locher, Green & Woods,* for defendant in error.

VICKERY, P. J. This action came into this court on a petition in error to the common pleas court of Cuyahoga county.

In the court below, Helen Yurek brought an action against Dr. Sidney May for damages which she alleges were occasioned to her by the conduct or acts of Dr. May. The accident which resulted in this injury, if there was any serious injury, is rather a peculiar one. It seems that Helen Yurek was an employee in a beauty parlor of the Statler Hotel, and that she had a friend by the name of Lillian Eaton, who was a manicurist in the barber shop in the same hotel, and that Miss Eaton was a friend of Dr. May. It seems that Dr. May at this time had a room in the hotel, and he had accepted an invitation to dine that evening with a Mr. Bloch from New York and his lady friend, a woman of some weight, if not substance, and we learn from the arguments of counsel and from the briefs that he was not very desirous of keeping the dinner engage ment with Mr. Bloch and his lady friend, a Mrs. Green, I believe, and desired to get out of that engagement. It seems that Mr. Bloch and Mrs. Green were in the doctor's room in the hotel, and he either invited, or was invited by, Miss Eaton to help her search for apartments, and he suggested that she come to his room and he might make some excuse for getting out of the engagement with his New York friend. She declined, however, to go to the room unless Helen Yurek, the plaintiff below, went likewise. They were both employed, as already stated, in the same hotel, in different departments. When Miss Eaton arrived in the doctor's room, she found Mrs. Green and Mr. Bloch there, and called Miss Yurek to come to the room. It was some little time before Miss Yurek could come, because, as she advised them, it was against the rules of the hotel

for any of the employees to go to the rooms occupied by a guest, but after a second call she did go up to the doctor's room, and there found Miss Eaton, Dr. May, Mr. Bloch, and Mrs. Green. Miss Yurek, working in a beauty parlor, upon seeing the heavy weight of each of the occupants of the room, Mr. Bloch, Mrs. Green, and Dr. May, was probably surprised, and a conversation was started as to how they could reduce in weight. Mrs. Green, I believe, weighed something like 250 pounds, Bloch was a large heavy man, and Dr. May himself weighed about 185 pounds. Miss Yurek was a slight girl, weighing about 125 pounds. She told them that by proper exercise they could reduce in weight, and she proposed that with the doctor she illustrate how it could be done; so she and the doctor took the floor, and she put her back to his back, and her right arm through his left arm, and her left arm through his right arm, and then she bent forward and raised him off the floor at an angle of about 45 degrees, and she explained how that would bring the muscles into play and tend to reduce the weight. At this point Dr. May said, ''Now *I* will show *you* something,'' and with that they reversed the operation, and he bent forward and brought Miss Yurek backward, and stooped so low that he precipitated her over his head onto the floor, which resulted, as the evidence shows, in a dislocation of the neck and other injuries. She became unconscious, and was ultimately treated, and the dislocation was finally reduced, and she then brought this suit to recover damages, alleging, first, two causes of action, or, rather, two grounds upon which she sought to recover: One, that the act of Dr. May was wilfully and

maliciously done; the other, that it was negligently done.

Upon the trial of the action, she was compelled to elect, and she elected to proceed on the ground that the act was negligently done, basing it upon negligence rather than upon willful misconduct. The petition was amended so as to conform to this theory of the case, and the petition alleged that the doctor seized her by the neck and threw her over his head, which caused the resulting injuries. The jury returned a verdict for $2,000, which verdict, we are informed, was set aside by reason of the misconduct of the plaintiff, or somebody connected with her, and a new trial was ordered. A new trial was had and heard before a different jury, and a verdict in the same amount was rendered against Dr. May, and it is to reverse that verdict that error is prosecuted here.

The error largely complained of is that there was no evidence in the record to sustain the allegations of the petition, that is, that he seized her by the neck and threw her over his head. The main argument in this is that that implied a willfulness in the doctor's conduct. The gravamen of the offense is, however, that he threw her over his head and injured her by dislocating her neck. That the result was not more serious, all of these parties are to be congratulated, for from the way this girl fell it is a wonder that her back or neck was not broken beyond repair.

Now, then, was there any evidence of negligence in this case? The court charged the jury that doing what a person ought not to do would be negligence, and we think there is authority for that statement.

Now the doctor, the plaintiff in error, is a powerful man, a graduate of Columbia University, a scientist versed in physics and chemistry, and apparently from the words that he said to Miss Yurek, "I will show you something now," he had in mind that with his strength he could show this little girl a trick which would be amazing to her. Whether or not he *intended* to throw her clear over his head, with his strong powerful body, is unimportant, for from the manner in which he had this girl on his back he could, with a sudden jerk or impulse, throw her clear over his head, and that is what he did do apparently from the evidence in this case; or, while he had her up in the air that way he may have slipped and fallen, and the injury have occurred in that way; but, however it was, he was a strong powerful man, and the plaintiff was a comparatively slight girl, though she had strength enough to lift him upon her back, as she explained she could, and as she did do, whereupon he reciprocated with this violent movement which precipitated her over his head, from which the injury resulted. Now, while there is not any evidence to show that he *seized* her by the *neck,* yet he did throw her over his head, and that was the gravamen of the offense charged in this petition.

We think the evidence shows that the injury resulted from this act of the doctor. From what he said one might almost conclude that it was a willful act upon his part, but, inasmuch as she elected to base her claim on negligence, and not upon willful misconduct on the part of the doctor, that is out of the case. But, if he did this act when he had no right to do it, then of course he would be liable for

the result of that act, even though he did not intend it, and nobody thinks for a moment that the doctor intended to injure this girl, even though he may have intended to throw her over his head. The evidence in the record shows that is what he intended to do, because he plainly said that he would show *her* something now.

After this fall, the girl became unconscious, and was taken home, and was finally taken to "The Clinic," where Dr. Nichols took an X-ray, and, according to the testimony of Dr. Nichols, there was at this time a dislocation of the neck, and then she went to Mt. Sinai Hospital, and Dr. Stern, a reputable doctor, and one of the staff of the hospital, undertook to and did reduce the dislocation. He suspended her by her head, with her feet entirely off the floor until this dislocation could be reduced, and I believe she was in that position for about a half an hour or more, and she was laid up for some time thereafter. And Dr. Stern made a collar which she wore for some time. Of course, this evidence is disputed. Dr. Maschke, a very reputable physician on the staff of Mt. Sinai Hospital, says that when an X-ray was taken by Dr. Freedman of the Mt. Sinai Hospital staff, it did not show any dislocation, but, of course, that was taken after the dislocation had been reduced. Dr. Nichols testifies as to the X-ray that he took before the dislocation had been reduced; and the testimony of Dr. Freedman and Dr. Nichols both might be correct, for one X-ray was taken before and one after the reduction of the dislocation. Of course Dr. Freedman testifies that the X-ray plate taken by Dr. Nichols did not show any dislocation or fracture; that it was a shadow that

appeared there and not necessarily a dislocation. Dr. Nichols, however, testifies the other way, that it was a dislocation, and that Dr. Stern apparently reduced the dislocation. In any event, the jury had the testimony before them, and it was submitted to them by the court on a proper charge, and the second jury that heard this case found against the contention of the doctor and found for the plaintiff, and we think there is evidence in this record which will sustain such a finding.

The case having been submitted to two juries of twelve persons each, and both having found for the plaintiff, we do not feel that we are called upon to disturb this verdict. The evidence shows that Miss Yurek had paid quite a considerable sum in money for medical and other expenses. The evidence also shows that Dr. May had contributed towards this. We do not think that the fact that he paid is necessarily evidence that he was guilty of any violation of duty toward the plaintiff, for it might have been out of generosity and feeling for this girl who was injured when they were mutually engaged in showing each other how to reduce that he paid this money, so what he said upon that subject, although it is competent evidence, we do not think necessarily implicates him, or that it is an admission by him that he was guilty of any wrongdoing.

As to the testimony which the court ruled out relative to certain inquiries on the other side, we think at the time it was sought to be introduced and in the manner in which it was introduced it was improper, and the court did not commit error, and the testimony was not offered afterwards in a dif-

ferent way, and therefore we do not think that it was error in this record that would warrant us in disturbing this verdict.

The question is: When the court charged the jury that they must find by a preponderance of the evidence that the plaintiff had sustained the allegations of her petition, was there any evidence to sustain a verdict rendered under such a charge? Now of course the allegations of the petition were that she was seized by the neck and thrown over the doctor's head, and I have already explained that the gravamen of the offense was that she was thrown over the doctor's head. Whether she was seized by the neck or the arms or in any other way does not seem to the majority of the court of any real importance. The evidence shows what did take place, and of course the petition, if necessary, could have been amended to conform to the evidence after the trial, and I am not so sure but that it could be done yet, if it is necessary.

We think the evidence in the case sustains the verdict. It is not a large verdict, for, as already stated, this young lady was very fortunate in not having her neck and back broken, and the doctor was likewise fortunate that such a dire result did not obtain from the accident.

On the whole, the majority of the court feel that there is sufficient evidence to sustain the verdict, and the judgment will therefore be affirmed.

*Judgment affirmed.*

SULLIVAN, J., concurs.
LEVINE, J., dissents.